**UNITED STATES of America, Plaintiff,**

**v.**

**Alan KAYE, Defendant.**

**No. 83 CR 980.**

United States District Court,
N.D. Illinois, E.D.

Aug. 23, 1984.

Dan K. Webb, U.S. Atty., Julian Solotorovsky, Ira Raphaelson, Asst. U.S. Attys., Chicago, Ill., for plaintiff.

Louis B. Garippo, Susan G. Feibus, Louis B. Garippo, Ltd., Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

From the very beginning of the trial—counsel's opening statements—it was obvious why Alan Kaye and his lawyers had elected a bench rather than a jury trial. As portrayed by his own taped words and his conduct, Kaye is as sleazy a human being as it is possible to imagine. That portrayal carried through the entire trial and even into closing argument, when Kaye's lawyer accurately described him as "reprehensible" and guilty of "clear violations of state law." What his lawyers rely on instead is the argument that though he is reprehensible, though he has committed criminal acts, he is not *federally* reprehensible and he did not commit *federal* criminal acts.

All of us have become too accustomed to viewing federal prosecutions as the principal, if not the sole, means of enforcing the integrity of state and local public officials. Federal waters are relied on to cleanse the Augean stables of city, county and even state officials' corruption. Unfortunately that reflects a dismal conception of the way things work in Chicago and Cook County—the so-called "city that works" or "county that works." That dismal conception is that the system cannot be relied on to police itself. And that conception has been fed by the even more unfortunate phenomenon of Operation Greylord, with its confirmation for the cynics that justice itself is sometimes for sale in Chicago and Cook County.

But this Court's function in criminal prosecutions is not that of a political science professor analyzing machine politics and how it can infect all the workings of government. Nor is it this Court's criminal justice role simply to play the reformer, seeking to assure that the system stays honest. And most significantly for current purposes, it is not this Court's duty to police Kaye's conduct generally, finding him guilty only because he and his conduct are disgusting—because he may be a thoroughly bad human being. Rather this Court's function in this bench trial is to consider the evidence against the backdrop of the *federal* criminal code, to see whether the charged federal offenses have been proved beyond a reasonable doubt.

One added comment may be in order before turning to the individual offenses charged. Much of the law in this area is the product of some rather strained reading of language. So it is that a mailing in furtherance of official corruption is held a violation of a mail fraud statute even though no tangible property may have been obtained from an identified individual victim. This is the theory of so-called "intangible rights," under which "fraud" may consist of depriving citizens generally, public officials and public employees of their right to have the business of government conducted honestly and free from corruption. That kind of charge has become so commonplace as the vehicle for prosecuting and convicting state and local public officials that no one any longer seems to recognize there may be some stretching of the English language implicit in it.

In any case that practice, and comparable stretchings of other statutory langauge such as that in the Hobbs Act (which grounds most of the counts in this indictment), have become recognized phenomena. All the established holdings in that respect will be the basis for the determinations here. This opinion will assume familiarity with, and therefore will not repeat, the reasoning of this Court's May 16, 1984 memorandum opinion and order (the "Opinion". 586 F.Supp. 1395). It should however be remembered that the Opinion dealt with an earlier version of the indictment from which former Counts One and Nine have now been dropped. So the mail fraud count, referred to as Count Two in the

Opinion, is now Count One of the current indictment, and the six Hobbs Act counts, referred to as Counts Three through Eight in the Opinion, are now Counts Two through Seven. Each type of charge will be considered in turn.

### Mail Fraud—Count I

Originally Kaye launched a three-pronged attack against this charge. Now he has conceded the first one, that the mailing involved—one to a fake process server for service of a divorce summons on the fake wife of the fake playboy Ronald Johnson, really FBI Agent Ronald Elder—was what the mail fraud statute calls "for the purpose of executing" the scheme to defraud. Opinion at 1401 gave Kaye's contrary argument short shrift, and now Kaye has given up on the issue.[1]

There is the second problem of "manufactured jurisdiction," an idea deplored by the Court of Appeals for the Second Circuit in *United States v. Archer*, 486 F.2d 670, 682 (2d Cir.1973) in eloquent language quoted in Opinion at 1401–02. That concept is not the same as "entrapment," which rests on the idea a defendant would not have committed *any* crime but for being lured into it by the undercover law enforcement agents. Instead "manufactured jurisdiction" rests on the notion the defendant *would* have committed a crime anyway, but the crime would have lacked an element necessary for *federal* prosecution had the government agent not injected an artificial ingredient needed for federal jurisdiction.

*Archer* has not found favor with later courts, though some recent trials and the related newspaper reporting strongly suggest juries are troubled by government-planned scenarios. That appears to have accounted for the DeLorean acquittal on entrapment grounds, and it was the focal point of attack by counsel for Judge Laurie, the so-called Operation Greylord defendant who was recently acquitted here.

Kaye's counsel criticizes the falsification by Elder-as-Johnson of a notarized official document, the fake divorce complaint. Certainly that was false swearing, though the parties dispute whether it was therefore the state crime of perjury. Additionally Kaye's lawyer points, as did Opinion at 1402, to Elder-as-Johnson's manufacture of a non-resident "wife," without whom there would not have been a mailing and therefore no possibility of a mail fraud charge. Nonetheless this Court need not decide whether to extend or expand the *Archer* concept in a way the later cases would not directly support.

That is so because one critical element of the mail fraud offense—the specific scheme to defraud charged in the indictment—has not been proved beyond a reasonable doubt. What Count One charges is that Kaye and his co-schemers—the late attorney Paul Ross and his associate:

> devised and intended to devise and participated in a scheme to defraud Cook County and its citizens, its public officials and its public employees of their right to have the business of the Cook County Circuit Court conducted honestly, fairly, impartially, free from corruption, collusion, partiality, dishonesty, conflict of interest, bribery and fraud, and in accordance with Illinois law.

But that has two problems:

1. Admittedly no judges were actually involved, so there was no public deprivation of the right to an honest court system in that respect.

2. On the evidence before this Court, neither Kaye nor Ross nor his associate could be said beyond a reasonable doubt to have been engaged in a scheme to conduct the *business of the state court* "corruptly" (or with any of the other pejorative adverbs or nouns charged in Count One).

---

1. That concession may perhaps have been a bit hasty. Last week's Court of Appeals' opinion in *United States v. Vanichromanee*, 742 F.2d 340, 349 (7th Cir.1984) reconfirmed the concept that the purely fortuitous presence of a neces-sary federal jurisdictional element can require acquittal. Because the government founders on another essential element of the mail fraud crime, the issue need not be pursued further.

Instead there is at least a reasonable doubt—and really substantially more than that—that would rather indicate that Kaye was engaged in a cottage industry of his own. Kaye's defrauding of litigants by pretending to be bribing judges, while really pocketing the money himself, may be a fraud and a criminal one—but it is not the *federal* fraud charged in the indictment.

By sheer coincidence, just last week our Court of Appeals upheld an "intangible rights" conviction in *United States v. Alexander,* 741 F.2d 962 (7th Cir. 1984). In doing so it (*id.* at 964) quoted this Court's decision in *United States v. Freedman,* 568 F.Supp. 450, 453 (N.D.Ill.1983) to the effect that:

[T]here is no doubt a private attorney who uses the mails to carry out a scheme to defraud involving the actual bribery of public officials is indictable under Section 1341 on an "intangible rights" theory.

Our Court of Appeals then went on to refer approvingly (741 F.2d at 965) to what this Court had done in *Freedman*:

[In *Freedman*] private attorneys were charged with "known and unknown" co-schemers in taking money from a client to bribe a judge. There was no allegation that the judge was bribed or knew anything about the scheme, and hence there was no basis for assuming that the judge was one of the known co-schemers. The court accordingly dismissed the indictment as insufficient under an intangible rights theory.

That has an obvious parallel to this Court's earlier rejection of part of the government's charges in this case once it was admitted that no judges were actually involved. But the impact of that decision is greater. Our Court of Appeals in *Alexander* (741 F.2d at 964) also cited with approval *Freedman's* holding that:

In contrast [to a mail fraud charge of a scheme to obtain tangible property through fraud], an intangible rights scheme is only cognizable when at least one of the schemers has a fiduciary relationship with the defrauded person or entity.

And that necessarily means the schemer must have been shown to have *breached* that fiduciary relationship. On that score the government's proof in this case fails.

True enough Kaye was a part-time deputy sheriff. But that was not, as the government would have it, shown beyond a reasonable doubt to have been the office he was selling. Certainly the evidence can be fairly viewed as demonstrating the deputy sheriff position was not the source, but rather merely one of a number of trappings, of the influence Kaye peddled. When Opinion at 1402–03 upheld the mail fraud count on that score, it relied on the legal attributes of the sheriff's office and the government's characterization of the expected evidence. But laying those attributes alongside what Kaye *actually* said and did leaves at least a reasonable doubt that Kaye did *not* take the bribes in the course of his duty of attending the courts or in violation of any duties he had either by statute or under common law. In that latter respect, the sweeping concept of the sheriff's "maintaining and protecting the dignity of the courts," as announced in the 90-year-old *Dahnke v. People* case (Opinion at 1403), did not embrace the more particularized charges here.

Thus one vital element of the mail fraud charge—the *federal* scheme to defraud the citizenry and government of intangible rights—has not been proved beyond a reasonable doubt. That compels acquittal on the charge.

### Hobbs Act—Counts Two through Eight

All the just-completed discussion bears on, but does not directly control, one ingredient of the Hobbs Act charges: that the extortion victim's consent had been induced "under color of official right." It does not control because, as Opinion at 1404–05 reflects, our Court of Appeals has taught in *United States v. Rindone,* 631 F.2d 491, 495 (7th Cir.1980) that the applicable standard is not the public officials' *actual* ability to perform the act but rather the *victim's* perspective of that ability.

■ But even under that less stringent test of "under color of official right," the charge does not survive. There is at least a reasonable doubt that either Zutler or Elder-as-Johnson had the belief that Kaye's effective authority to fulfill his promises was a function of his office as deputy sheriff—what *Rindone* referred to as "the power in fact of the defendant's office." And as already implied in the prior section of this opinion, there is substantial evidence—surely enough to create a reasonable doubt—that it was really Kaye's claimed general clout as a fixer, his contacts individually and through others (including Ross) rather than via his deputy sheriff status, that Zutler and Elder-as-Johnson were looking to.

That however does not end the inquiry, for each of the Hobbs Act counts charges the consent to pay Kaye the fix money was induced not only by "color of official right" but also by Kaye's "wrongful use of actual and threatened fear of economic harm." Under the law, even though the indictment charges *both* the official-right and the fear-of-economic-harm theories, Kaye could be convicted if *either* of those propositions was shown beyond a reasonable doubt. And because some, though clearly not all, the payments did involve threats of economic harm within the scope of our Court of Appeals' recent decision in *United States v. Lisinski*, 728 F.2d 887 (7th Cir. 1984), it is necessary to turn to the critical *federal* ingredient necessary to support a Hobbs Act conviction.

That requirement is that the defendant must have attempted to affect, or must actually have affected, "commerce" in the sense of "interstate commerce." Even though the Commerce Clause of the Constitution might have permitted a broader sweep, in relevant part the Hobbs Act says:

> The term "commerce" means ... all commerce between any point in a State ... and any point outside thereof....

As Opinion at 1403–04 said:

> In this circuit the required link to interstate commerce can be established by showing (1) a business that engages in interstate commerce and (2) wrongful activity that depletes the business assets and thus restricts other potential transactions in interstate commerce. *United States v. Boulahanis*, 677 F.2d 586, 590 (7th Cir.), *cert. denied* [459 U.S. 1016], 103 S.Ct. 375 [74 L.Ed.2d 509] (1982). That depletion-of-assets theory is not available when the victim is an individual rather than a business. *Id.; United States v. Mattson*, 671 F.2d 1020, 1024–25 (7th Cir.1982).

■ Here it is important to look at just what the Hobbs Act counts charge. All except Count Three assert (emphasis added):

> Alan Kaye knowingly did attempt to and did affect commerce ... by extortion ... *in that* the defendant wrongfully obtained property in the approximate amount of $[—] from [Leo Zutler or Ronald Elder].

Count Three, involving the aborted effort to extract $30,000 from Elder-as-Johnson, differs only in that it omits any claimed actual effect on commerce, stating only (emphasis added):

> Alan Kaye knowingly did attempt to affect commerce ... by extortion ... *in that* the defendant wrongfully requested property in the approximate amount of $30,000 from Ronald Elder....

As to all of those counts there is far more than a substantial doubt—rather it appears on analysis that not one of those wrongful extortions of money or attempted extortions of money affected interstate commerce or attempted to do so.

As for the Zutler payments, he was an *individual* and therefore within the *Mattson* rule. Of course he derived his income from his business, but the $7,000 he paid clearly came in the form of personal funds. As for the first $5,000, it was borrowed by Zutler personally from a friend, and Zutler expected to repay the loan with money taken out of his business, charged to his drawing account and then treated as either salary or a bonus. That of course is a frequent practice in closely held business-

es, in which the principal often believes as Zutler testified expansively:

I *am* the business.

As for the other $2,000, Zutler in fact obtained the money from the FBI. Its character as individual assets, and not business assets, is no different from the original $5,000.

Analogies always pose some danger of inaptness or of being misunderstood. But it might be pointed out that lawyers, for example, derive their income from clients' fees. Yet that fact, even when coupled with the clients' activities in interstate commerce, does *not* mean that money extorted from a lawyer in his personal life, in connection with a divorce, would affect interstate commerce within the meaning of the Hobbs Act.

As for the $3,000 in Elder-as-Johnson payments made for Zutler's benefit, and the $30,000 sought to be extorted from Elder-as-Johnson himself, all those were made and sought with the view of Ronald Johnson as a wealthy individual with no gainful business or employment at all. In addition to his supposed securities, he supposedly had $200,000 in liquid funds: a money market account, the equivalent of cash.

So it is there is substantially more than a reasonable doubt about the absence of the vital interstate commerce element from each Hobbs Act count. All the government's arguments on that score really have the wrong focus.

For example the government urges Zutler's wife might have obtained up to a half interest in Zutler's business (a corporation engaged in interstate commerce) or in certain Florida real estate, and Zutler's $5,000 fixer payment was intended to prevent that. Zutler says otherwise; he claims his payment was made to get his already-long-delayed case heard quickly rather than delayed indefinitely, and not to get a more favorable result than one to which he was entitled. But even if that version is discredited, it is doubtful the transfer of personal ownership of real estate in another state, or personal ownership of stock in a corporation engaged in interstate commerce, is itself an *effect* on interstate commerce. And even on the doubtful proposition that it could be, *that* is after all not what the indictment charges. Instead the indictment charges an effect on interstate commerce *in that* money was requested and paid. In plain English that charges an effect on interstate commerce *by the payment of money*, a contention on which there has been a failure of proof in *Mattson* terms.

Nor does it do for the government to refer to the fact the *actual* Elder-as-Johnson money was furnished from the government's undercover account, which would have to be replenished from Washington if the undercover funds here ran out. That line of reasoning is at odds with the principles that apply and should apply to undercover investigations.

Once again our Court of Appeals has addressed a closely-related concept only last week in *United States v. Vanichromanee*, 742 F.2d 340 (7th Cir.1984). In the course of upholding a conviction on charges of interstate racketeering, the Court found interstate travel—a necessary ingredient of that offense, like interstate commerce in a Hobbs Act case—had been "designed to promote, carry on, or further that illegal purpose" (*id.* at 349). It distinguished other cases where convictions had been reversed because the travel or other necessary federal elements of the crimes charged had been merely "fortuitous or isolated and incidental" (*id.*). By coincidence one of those cases had also involved one of the early "intangible rights" convictions, that of former Governor and Judge Otto Kerner and former Illinois Director of Revenue Theodore Isaacs, *United States v. Isaacs*, 493 F.2d 1124, 1146–49 (7th Cir.), *cert. denied*, 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146 (1974). In exactly the sense used by *Isaacs* and by the other cases cited in *Vanichromanee*, the government's invocation of claimed interstate commerce effects here refers to items wholly "fortuitous or isolated and incidental," and thus insufficient to sustain a conviction.

Finally the government's argument about the threat to burn down Zutler's business building if he did not pay—a threat that would surely have impacted interstate commerce if implemented—also does not bear analysis in terms of what the indictment charges. Remember again the indictment says Kaye "attempted to affect commerce ... *in that* Kaye wrongfully obtained money from Zutler." Here the *payment* did not represent an effect or attempted effect on commerce. On the contrary the threat to affect commerce was intended to induce a payment that did not itself affect commerce at all. In other words, the reference to burning the building went to the element of threatened fear of economic harm, but not at all to the attempted effect or actual effect on commerce by the *payment* charged in the indictment.

Consequently one of the necessary ingredients of each Hobbs Act count—the requisite effect on interstate commerce—has not been proved beyond a reasonable doubt. So acquittal is regrettably necessary on those counts as well.

### Conclusion

All this has the surface flavor of a miscarriage of justice. How can this man, accurately called "reprehensible" by his own lawyer in a masterpiece of understatement, go free? But the reason he goes free is that he has been charged with a *federal* crime when he has in fact committed *state* crimes—the essential link to federal jurisdiction is absent. It is no different from charging a murderer of a kidnapped person—a person who has thus committed a state crime—with the federal crime of kidnapping if the victim has not been "wilfully transported in interstate ... commerce," an essential element under the so-called Lindbergh Act, 18 U.S.C. § 1201. Such a criminal would also go free in the federal courts, but would remain responsible for his conduct in the state justice system.

Two things are of paramount importance here:

1. Our rule of law has been preserved, in which no one can be convicted merely because he or she is a bad person, but conviction can be obtained only because every element of the crime actually charged has been proved beyond a reasonable doubt.

2. Kaye need not go unpunished. State crimes, freely acknowledged by his lawyers, can still be charged. There appears to be no reason to believe justice, served here by an acquittal on unproved federal charges, cannot be further served by indictment and possible conviction of state charges properly brought.

That latter issue however is for another day and perhaps another court. For the present this Court is compelled to find defendant Alan Kaye not guilty as charged in the indictment.